**Signed: June 02, 2006**



_____
**LESLIE TCHAIKOVSKY
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                                    No. 04-41044 T
                                                         Chapter 11
QMECT, INC., etc.,

    Debtor-in-Possession.
_____/

**MEMORANDUM OF DECISION RE PROCEEDS ISSUE**

    The Court scheduled a final evidentiary hearing on the motion of Burlingame Capital Partners II, L.P. ("Burlingame") and Electrochem Funding, LLC ("Burlingame Funding")(collectively "Lenders") for relief from the automatic stay for May 24, 2006. The Lenders filed a trial brief prior to the scheduled hearing in which they argued that, notwithstanding 11 U.S.C. § 552, their security was not "cut off" as of the petition date. Although the orders granting the debtor ("Qmect") the right to use the Lenders' cash collateral granted them replacement liens in assets acquired or created by Qmect post-petition, according to the Lenders, they were not limited to the interest created by the replacement liens. Since all of the assets acquired or created by Qmect post-petition were acquired or created

with their pre-petition collateral, all of the assets acquired or created post-petition constituted the proceeds of their collateral.

As the Court noted in a prior memorandum, this argument assumed that the value of the collateral was less than the amount of the Lenders' claims. This assumption could not be relied upon until the Court resolved the claim asserted by the Official Creditors' Committee (the "Committee") that the Lenders had violated the regulations governing their license as finance lenders and as a result had lost their exemption from the usury laws. If not, their claims might be less than the value of the collateral. As discussed in a separate memorandum, the Court has concluded that the Committee's usury claim fails.

Qmect requested an opportunity to brief the "proceeds" issue, and the Court granted the request. The parties have filed their briefs, and the Court has reviewed them. The Court's conclusions are set forth below.[1]

## DISCUSSION

Section 552(a) of the Bankruptcy Code provides that:

> Except as provided in subsection (b)...,property acquired by the estate or by the debtor after the commencement of the case is not subject to

---

[1] The Lenders apparently misunderstood the purpose of the briefing schedule. Instead of tailoring their arguments to the "proceeds" issue as the Court directed, they reiterated their arguments concerning their rights pursuant to the Court's cash collateral orders. The Court has previously indicated that, if that the Lenders are relying on those orders as to their rights in the post-petition assets, it will require the presentation of valuation evidence. The Court deferred the presentation of that evidence because, if the Lenders "proceeds" theory were persuasive, no valuation would be necessary.

2

> any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

Section 552(b)(1) provides, in pertinent part, that:

> ...[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds...of such property, then such security interest extends to such proceeds...acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(a),(b)(1).

The Court has previously concluded that, between them, at the time the bankruptcy case was filed, the Lenders held a "blanket lien" on all of Qmect's pre-petition assets with the exception of two or three trucks used in the operation of the business, referred to hereafter as the "Trucks". Based on the Court's findings and conclusions, as set forth in other memoranda, it is clear that, at the time the chapter 11 case was filed, the value of the Lender's collateral was less than the combined amount of their claims. Moreover, it does not appear to be disputed that the Lenders' security interests, by their terms, extend to the proceeds of the Lenders' collateral.

Based on the foregoing, the Lenders contend that all of the accounts receivable generated by Qmect post-petition and the funds collected from those accounts receivable are the proceeds of their pre-petition collateral. As a result, they contend it is unnecessary

3

to value their collateral at the time of the filing and would be improper to limit their interest in the funds on hand now to that value. In support of this contention, they cite In re Bumper Sales, Inc., 907 F.2d 1430, 1439 (4th Cir. 1990).

In Bumper Sales, a secured creditor with a pre-petition lien in all of the debtor's assets consented to the use of its cash collateral without obtaining a replacement lien. It was undisputed that all of the new inventory and accounts receivable generated by the debtor post-petition was created through the use of the secured creditor's cash collateral: i.e., that the debtor "did not borrow any outside funds or incur any outside debt...." Id. at 1433. The debtor contended that, based on 11 U.S.C. § 552(a), the secured creditor's pre-petition lien did not extend to the inventory and accounts receivable created post-petition. The secured creditor disagreed, arguing that these post-petition assets were the proceeds of its pre-petition collateral and thus subject to its security interest pursuant to 11 U.S.C. § 552(b). The Bumper Sales court ruled for the secured creditor, relying on the applicable state law definition of the term "proceeds." Id. at 1435-41.

Qmect notes that Bumper Sales is not binding authority in this Circuit. In any event, it argues that Bumper Sales is distinguishable on its facts. As noted above, in Bumper Sales, it was stipulated that all of the post-petition assets were created through the use of the secured creditor's collateral and that the debtor neither borrowed money from anyone else nor incurred other debt post-petition. In the instant case, Qmect reminds the Court

4

that, shortly after its chapter 11 case was filed, a third party loaned Qmect $150,000 to make payroll. In addition, it notes that the Trucks, which were unencumbered, contributed to the value created post-petition.

Qmect contends that the more relevant authorities are <u>In re Skagit Pacific Corp.</u>, 316 B.R. 330 (Bankr. 9th Cir. 2004), <u>In re Cafeteria Operations</u>, 299 B.R. 400 (Bankr. N.D. Tex. 2003), and <u>In re Photo Promotion Associates</u>, 61 B.R. 936 (Bankr. S.D.N.Y. 1986).

In <u>Photo Promotion</u>, a secured creditor had a blanket lien on all of the assets of the debtor which provided photographic portrait services in shopping malls and department stores. When the debtor's chapter 11 case was converted to chapter 7, the trustee obtained authorization to borrow funds from someone other than the secured creditor. Nevertheless, the secured creditor claimed the payments for the portraits as the proceeds of its collateral. It had liquidated its other assets and still had a substantial deficiency. <u>Id.</u> at 937-38.

The <u>Photo Promotion</u> court accepted the contention that the payments were the proceeds of the secured creditor's collateral. However, it observed that, if the orders had not been completed and completed promptly, they would have been of little or no value. Consequently, based on the equities of the case, it held that all of the proceeds should be treated as unencumbered property of the estate. <u>Id.</u> at 938-40.

Thus, <u>Photo Promotion</u> stands at the other end of the spectrum from <u>Bumper Sales</u>. In <u>Bumper Sales</u>, by stipulation, only the secured

5

creditor's collateral was used to produce the post-petition asset; in Photo Promotion, the only portion of the secured creditor's collateral used to produce the post-petition asset was found to be of little or no value. The facts of the instant case bring it somewhere between these two extremes.

In Cafeteria Operators, the debtors operated family style restaurants in several states. The debtors did not dispute that the secured creditor held a "blanket security" interest in the debtors' assets which extended to the proceeds of its collateral. Id. at 408. However, the debtors contended that the revenues of its food sales did not constitute the proceeds of the secured creditors' collateral because the revenues were primarily generated by services: i.e., the value of the food component of a meal was less than one-third of the price of the meal. Id. at 408.

The Cafeteria Operators court adopted a middle ground. It concluded that, because a portion of the value of the revenues was produced by the secured creditor's collateral--i.e., the food component--the revenues were the proceeds of the secured creditor's collataral. However, based on the equities, it limited the value of the secured creditor's interest in the revenues to the value of its inventory. Id. at 410.[2] This is the approach argued for by Qmect.[3]

---

[2] The Cafeteria Operators court recognized that the debtors' fixtures and equipment also contributed to the production of the revenues. However, it concluded that restaurant revenues could not qualify as the "proceeds" of this type of asset. Id. at 408.

[3] The Court notes that there is no discussion in Cafeteria Operators of whether the debtors borrowed money post-petition from any outside source or incurred unsecured debt to third parties

6

The final case to be examined is <u>Skagit Pacific</u>, the only case cited from this jurisdiction. In <u>Skagit Pacific</u>, the debtor manufactured and sold modular offices and trailers. The parties agreed that the secured creditor had a perfected security interest that extended to the proceeds in all of the debtor's assets except the vehicle and trailer inventory.[4] After filing for chapter 11, the debtor obtained a contract to build four modular trailers. Shortly after completing the project and before receiving payment, the case was converted to chapter 7. The secured creditor claimed the payment as the proceeds of its collateral. <u>Id.</u> at 332-34.

The secured creditor contended that the proceeds of its collataral had been used to produce the trailers for which the disputed payment was made. The bankruptcy court conducted an evidentiary hearing at which the secured creditor presented evidence regarding the deposits and withdrawals from the debtor's accounts. Based on the evidence presented, the bankruptcy court granted relief as to approximately one-half of the payment. <u>Id.</u> at 334. On appeal, the bankruptcy appellate panel reversed.

The <u>Skagit Pacific</u> panel noted that the proceeds of post-petition accounts receivable do not automatically constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable. It noted further that revenue generated solely

---

during the chapter 11 case.

[4] As to those assets, the secured creditor took possession of the certificates of title but failed to perfect its security interest by having its name placed on title. <u>Id.</u> at 333, 340-42.

7

by services do not constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable. Id. at 336.

The panel acknowledged that a secured creditor could claim the proceeds of a post-petition account receivable if it could properly trace the proceeds to its pre-petition collateral. Id. at 337. However, if the proceeds of the pre-petition collateral were commingled with funds obtained from some other source, the secured creditor must present detailed evidence tracing the funds claimed as proceeds. The panel concluded that the secured creditor had failed to do this.

Traditionally, tracing is done using the lowest intermediate balance rule. Id. at 338. This rule assumes that the traced proceeds are the last funds withdrawn from the commingled account. However, once the traced proceeds are withdrawn and spent, the security interest disappears. The security interest does not reappear or increase if additional funds from another source are later deposited into the account. Thus, the security interest is limited to the lowest balance in the account during the period in question. Id. at 338-40.

The Court will adopt the approach set forth in Skagit Pacific, which is the most authoritative case in this jurisdiction and the rationale of which appears sound. Like the Cafeteria Operators court, the Court does not believe fact that the Lenders' lack of a security interest in the Trucks diminishes their right to claim the post-petition assets as their proceeds. However, if the proceeds of the pre-petition accounts receivable were commingled with the

8

$150,000 loan made by a third party post-petition, the secured creditor will be required to trace its security interest in the proceeds of the pre-petition accounts receivable into the post-petition assets using the lowest intermediate balance rule.[5]

The Court does not believe oral argument is necessary with respect to this issue. However, the Court directs the parties to appear by telephone for a status conference on Monday June 5, 2006 at 3:00 p.m. to discuss how best to proceed with respect to this issue. The parties are directed to coordinate their appearance for this purpose with the judge's calendar clerk.

END OF DOCUMENT

---

[5] The Court does not mean to imply that, if the Lenders are unable to trace their pre-petition security interest into the post-petition assets, they may not rely on their rights pursuant to the cash collateral orders. Similarly, the Lenders may be able to supplement rights established under one theory with rights established under another. However, as discussed above, if the Lenders wish to rely on the cash collateral orders to any extent, valuation evidence must be presented.

9

COURT SERVICE LIST

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

Robert R. Moore
Allen Matkins Leck Gamble & Mallory LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111

Philip J. Nicholsen
Law Offices of Philip J. Nicholsen
221 Main St., #740
San Francisco, CA 94105