**Signed: June 26, 2006**



_____
**LESLIE TCHAIKOVSKY
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                    No. 04-41044 T
                                         Chapter 11
QMECT, INC., etc.,

    Debtor-in-Possession.
_____/

**SECOND MEMORANDUM OF DECISION RE PROCEEDS ISSUE**

    On June 2, 2006, the Court issued a Memorandum of Decision ("Proceeds Memo I") with regard to the claim of Burlingame Capital Partners II, L.P. ("Burlingame") and Electrochem Funding, LLC ("Burlingame Funding")(collectively the "Lenders") for relief from the automatic stay with respect to Qmect, Inc.'s (the "Qmect") post-petition accounts receivable, inventory acquired, and cash (the "Post-Petition Assets"). Based on the applicable authorities, the Court concluded that, if the Post-Petition Assets had been acquired or generated solely through the use of the Lenders' pre-petition collateral, pursuant to 11 U.S.C. § 552(b), the Lenders were entitled to claim the Post-Petition Assets as their collateral as well as the proceeds of their pre-petition collateral. However, if their pre-petition cash collateral had been commingled with funds not

subject to their security interest, they would be required to trace their funds into the Post-Petition Assets, using the lowest intermediate balance methodology, to establish their right to claim some or all of the Post-Petition Assets as their collateral.

The parties were provided with a schedule for providing an evidentiary basis for the Court to determine the Lenders' rights as well as to file briefs asserting their legal positions based on the evidence provided. The Court has reviewed the evidence and argument provided and presents its factual and legal conclusions below.

## SUMMARY OF FACTS

Qmect filed its chapter 11 bankruptcy petition on February 27, 2004. On the next business day, March 1, 2004, Qmect filed an emergency motion for authority to obtain a post-petition loan (the "Post-Petition Loan") from an individual named Brian Fitzpatrick ("Fitzpatrick") and well as a interim motion for use of cash collateral. In fact, Fitzpatrick had already advanced approximately $50,000 of the proposed loan by making payments directly to various pre-petition creditors of Qmect.

A hearing was conducted on the two motions on March 2, 2004. At the conclusion of the hearing, the Court authorized Qmect to obtain the loan. The only clarification sought by the Lenders in connection with that motion was that the loan proceeds would become part of their borrowing base. Qmect affirmed that this was so. In connection with the cash collateral motion, the Lenders expressed concerns about some of the proposed expenditures listed in the budget. The parties agreed to meet and confer and so as to agree on

2

a form of order. Orders authorizing the Post-Petition Loan and approving the use of cash collateral were signed by the Court on March 9, 2004 (the "Post-Petition Loan Order" and the "Interim Cash Collateral Order," respectively). The Interim Cash Collateral Order stated expressly that the Lenders agreed to Qmect's use of their cash collateral on an interim basis.

On March 3, 2004, the remaining post-petition loan funds in the approximate amount of $100,000 were wire transferred into Qmect's checking account at the Bank of America (the "BofA Account"). Just prior to the wire transfer, the BofA Account held approximately $41,000 of Qmect's funds, which the Court has assumed constituted the Lenders' collateral. Thus, immediately after the wire transfer, the BofA Account held approximately $141,000. Thereafter, from March 3 to 5, 2004, Qmect issued checks or caused funds to be transferred automatically to creditors in amounts totaling approximately $100,000. Thus, when these disbursements had been made, there was again a balance of approximately $41,000 in the BofA Account. The Lenders have established that all but slightly more than $1,000 of the $100,000 disbursed between March 3 and 5, 2004 went to pay pre-petition obligations.[1]

---

[1] The remaining $1,000 may also have gone to pay pre-petition obligations. The Lenders were simply unable to establish that fact.

**DISCUSSION**

**A. ARGUMENTS**

The Lenders contend that all of Qmect's Post-Petition Assets were acquired or generated solely through the use of its cash collateral and thus constitutes the proceeds of their pre-petition security interest pursuant to 11 U.S.C. § 552(b)(1). Thus, they contend that they are entitled to relief from the automatic stay to foreclose on the Post-Petition Assets.

The Lenders acknowledge that traditionally, when funds are commingled, the secured creditor has the burden of proof of tracing its collateral into the debtor's current assets. However, the Lenders contend that the burden should be shifted to Qmect under these circumstances because Qmect acted improperly by failing to segregate their cash collateral as required by 11 U.S.C. § 363(b)(2) and by using the proceeds of the Post-Petition Loan to pay pre-petition debt without obtaining a court order authorizing them to do so. In support of this contention, they cite <u>Freightliner Market Dev. Corp. v. Silver Wheel Freightlines, Inc.</u>, 823 F.2d 362, 368 (9th Cir. 1987).

Moreover, even if they are required to trace, the Lenders contend that they have effectively done so. They note that they have established that virtually all of the Post-Petition Loan was used to pay pre-petition debt, not to generate new inventory and accounts receivable. Finally, the Lenders reiterate their argument that, because the Court has found that they hold a "blanket lien," they should automatically be entitled to claim the Post-Petition Assets as

4

the proceeds of their pre-petition security interest. In support of this proposition, they cite <u>In re Bumper Sales, Inc.</u>, 907 F.2d 1430 (4th Cir. 1990).

The Lenders note that, in <u>In re Skagit Pacific Corp.</u>, 316 B.R. 330 (Bankr. 9th Cir. 2004), in which the Court required the creditor to trace, the creditor did not have a "blanket lien." In addition, the creditor was an insider and was responsible for the commingling. Thus, it was fair under those circumstances to require the creditor to bear the burden of tracing. It would not be fair here, according to the Lenders, where Qmect was responsible for the commingling.

By contrast, Qmect argues that the burden of proof should not be shifted under these circumstances.[2] It disputes that it acted improperly by failing to segregate and commingling the Lenders' pre-petition cash collateral or by paying pre-petition debt without an express order authorizing it to do so. Qmect notes that the Lenders consented to the Interim Cash Collateral Order, which did not require segregation and clearly contemplated the payment of pre-petition debt.

While the Court did not expressly approve the payment of pre-petition debt, they assert, such approval was implicit in the Interim Cash Collateral Order. In addition, according to Qmect, it would have made no sense to segregate the Lenders' pre-petition cash collateral from the proceeds of the Post-Petition Loan since the

---

[2]Qmect and the Official Committee of Unsecured Creditors (the "Committee") filed a joint brief. For simplicity, when referring to the positions taken in the brief, the Court will refer to these two parties collectively as Qmect.

5

Lenders were given a security interest in the proceeds of that loan.

However, Qmect contends that the Lenders should not be entitled claim a security interest in the Post-Petition Assets by tracing. It asserts that, in a footnote in <u>Freightliner</u>, the Ninth Circuit Court of Appeals held that, if a creditor consents to the use of its collateral or the court authorizes its use, the creditor loses its right to trace proceeds. 823 F.2d at 367, n.4. Qmect notes that the <u>Freightliner</u> court relied on <u>In re Lovelady</u>, 21 B.R. 182, 184-85 (Bankr. D. Or. 1982) for this holding. It also notes that the <u>Skagit</u> court cited <u>Lovelady</u> with approval. See <u>Skagit</u> at 336, n5.[3]

Finally, Qmect contends that, even if the Lenders are permitted to trace, tracing will give them nothing more than what they would be entitled to pursuant to their replacement lien.[4] Qmect argues that the Lenders' rights are essentially frozen at their secured position at the time the bankruptcy was filed. Any increase in value belongs to the estate. Thus, according to Qmect, a valuation hearing is necessary, as previously contemplated.

---

[3] Qmect concedes that the <u>Bumper Sales</u> court disapproved the holding in <u>Lovelady</u>. See <u>Bumper Sales</u> at 1440, n.13. Thus, according to Qmect, Ninth Circuit law differs from Fourth Circuit law on this point.

[4] To illustrate this point, Qmect cites the operation of the lowest intermediate balance methodology as applied to a bank account containing commingled funds. The problem with this illustration is that it deals with a closed system. In other words, in these examples, the only question is who is entitled to the remaining funds in the bank account. It does not contemplate that the funds in the bank account have been used to generate noncash assets of greater value than the funds.

6

In reply, the Lenders contend that, notwithstanding the Interim Cash Collateral Order, Qmect was legally required to segregate their pre-petition cash collateral. Thus, they repeat that the burden of tracing should be shifted to Qmect. They characterize as dicta the assertion made by the <u>Freightliner</u> court in footnote 4 that, when a secured creditor consents to the use of its cash collateral or a court order authorizing its use is entered, the secured creditor loses the right to trace.

In addition, the Lenders take issue with Qmect's contention that, even if they are able to trace, their security interest in the Post-Petition Assets is limited by the value of their interest in Qmect's assets at the time the bankruptcy was filed. The Lenders contend that, to the extent they can establish that all of the Post-Petition Assets were produced solely through the use of their collateral, they are entitled to all of the Post-Petition Assets up to the amount of their claim. Thus, they contend that, under applicable law, a secured creditor under these circumstances, not the debtor, is entitled to any post-petition appreciation in the value of their collateral.

**B. DECISION**

Based on the foregoing arguments, the Court identifies four issues: (1) whether the Lenders have lost their right to trace by consenting to Qmect's use of cash collateral, (2) who has the burden of proof on tracing,(3) whether the party bearing the burden on the tracing issue has satisfied that burden, and (4) the extent of the

7

Lenders' rights in the Post-Petition Assets based on the evidence presented. These issues are addressed below.

### 1. Effect of Lenders' Consent to Use of Cash Collateral on Tracing Right

As noted above, Qmect contends that the Lenders lost their right to trace their pre-petition security interest into the Post-Petition Assets by consenting the use of their cash collateral. Thus, according to Qmect, the Lenders' rights are limited to those obtained by virtue of their replacement lien. As the Court previously indicated, a valuation hearing would be required to establish the Lenders' rights pursuant to their replacement lien.

Qmect bases this contention on footnote 4 in <u>Freightliner</u>. The Lenders contend that the statement in footnote 4 is dicta and should not be followed by the Court. The Court agrees. In <u>Freightliner</u>, the debtor violated 11 U.S.C. § 363(c)(2) by using the secured creditor's cash collateral without the secured creditor's consent or a court order. The <u>Freightliner</u> court observed that, pursuant to 11 U.S.C. § 363(c)(4), unless a trustee obtains a court order or consent, he is required to segregate and account for any cash collateral. Because the trustee failed to do so, the parties were unable to trace their pre-petition security interest into the post-petition assets.

Two issues were presented: (1) under the circumstances, whether the burden of proof on tracing should be shifted to the trustee and (2) whether a secured creditor's consent to use of cash collateral had to be express. The <u>Freightliner</u> court answered both questions

in the affirmative. The Freightliner court was not required to rule on the effect of a secured creditor's consent to the use of cash collateral on its right to trace. Therefore, the statement made in footnote 4 was dicta.

Moreover, the Court is persuaded that the statement misstates the law. The Court notes that the case cited by the Freightliner court in support of its statement in footnote 4--stated that, *under Oregon law*, a secured creditor loses its right to trace proceeds if it consents to the use of its collateral. See Lovelady at 184. Like Lovelady, Freightliner was also decided at least in part under Oregon law. Thus, even if the statement were not dicta, it might not apply here where the governing state law is California law. Qmect notes that Lovelady was cited with approval in Skagit. However, the Skagit court states the proposition more equivocally: i.e., "If the creditor fails to obtain...[a replacement lien and/or a priority claim], its consent to the use of proceeds **may** destroy its right to trace those proceeds into other products." See Skagit at 336, n.5 [emphasis added].

Nothing in the Bankruptcy Code, of which the Court is aware, states that a creditor loses its rights under 11 U.S.C. § 552(b)(1) by consenting to the use of its cash collateral. Such an important consequence would surely be set forth expressly in the statute. Thus, the Court concludes that the Lenders did not waive their right to trace by consenting to the Interim Cash Collateral Order.

9

### 2. Who Has the Burden of Proof on Tracing

As noted above, the Lenders acknowledge that, traditionally, when a secured creditor's cash collateral has been commingled, the secured creditor has the burden of proof on tracing. However, the Lenders contends that, when the commingling occurs wrongfully, the burden should be shifted to the party responsible for the wrongful commingling. In support of this proposition, they cite <u>Freightliner</u>. In this case, the Lenders contend, Qmect acted wrongfully by commingling their cash collateral and should have the burden of establishing that the Post-Petition Assets are not the proceeds of their pre-petition security interest.

Qmect contends that the commingling was not wrongful. It notes that, in <u>Freightliner</u>, the trustee did not obtain either the creditor's consent to the use of the cash collateral or a court order. Qmect obtained a court order with the Lenders' express consent. The Interim Cash Collateral Order did not require Qmect to segregate the proceeds from the Post-Petition Loan from the Lenders' pre-petition cash collateral. Moreover, as Qmect points out, this might well have seemed pointless since the Lenders were given a replacement lien in those proceeds. As a result, the Court concludes that Qmect did not act wrongfully in failing to segregate the Lenders' cash collateral. As a result, there are no grounds to shift the burden of proof to Qmect.

### 3. Whether Burden of Proof on Tracing Has Been Satisfied

The Court concludes that, except with respect to slightly more than $1,000 of the proceeds of the Post-Petition Loan, the Lenders

10

have met their burden of tracing their pre-petition security interest into Qmect's Post-Petition Assets. As stated in the Proceeds Memo I, the Court assumes that the $41,000 in the BofA Account on the petition date was the proceeds of the Lenders' pre-petition security interest.[5] The Lenders have effectively established that all but slightly more than $1,000 of the $100,000 of the Post-Petition Loan deposited into the BofA account on March 3, 2004 went to pay pre-petition debt. As a result, these funds were not used to generate any portion of the Post-Petition Assets.

### 4. Extent of Lenders' Rights in Post-Petition Assets Based on Evidence Presented

The final issue presented is the extent of the Lenders' security interest in the Post-Petition Assets based on the evidence presented. The Lenders contend that they have met their burden of tracing their pre-petition collateral into the Post-Petition Assets and should be granted relief to foreclose against those assets in their entirety. In support of this contention, they cite 11 U.S.C. § 552(b)(1) and various case authority, in particular, <u>Dewsnup v. Timm</u>, 502 U.S. 410 (1992) and <u>In re 1441 Veteran Street Co.</u>, 144 F.3d 1288, 1292 (9th

---

[5] Qmect suggests that this assumption may be inaccurate. However, it asserts that this is an issue for another day. The Court agrees that, for purposes of a final determination, the Court's assumption may be challenged at a later date. However, the Court does not view the accuracy of this assumption as an issue for another day with respect to the Lenders' motion for relief from stay. The purpose of this briefing schedule was made clear to the parties. If Qmect wished to challenge the Court's assumption on this point, it should have presented evidence supporting its challenge.

11

Cir. 1998). In the form applicable to this case, 11 U.S.C. § 552(b)(1) provides as follows:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548...[of the Bankruptcy Code], if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Qmect contends that a valuation hearing is still necessary. It asserts that the Lenders' rights established by tracing pursuant to 11 U.S.C. § 552(b)(1) are no greater than their rights pursuant to a replacement lien. The Court has previously stated its belief that the Lenders' replacement lien in Qmect's Post-Petition Assets was limited to the value of their security interest in those assets at the time of filing. The only support for this position is a citation to illustrations of the operation of the lowest intermediate balance methodology with respect to a bank account, as set forth in the Restatement Second of Trusts. The problem with this citation is that it does not address a secured creditor's right to proceeds pursuant to 11 U.S.C. § 552(b)(1).[6]

---

[6] There is at least one reported decision that supports Qmect's position. See In re Reddington/Sunarrow, Ltd., 119 B.R. 809, 813 (Bankr. D.N.M. 1990), cited in In re Machinery, Inc., 287 B.R. 755, 762 (Bankr. E.D. Mo. 2002). However, it clearly represents a

12

The Court finds <u>Dewsnup</u> inapposite. In <u>Dewsnup</u>, the issue presented was whether a chapter 7 debtor could "strip down" the value of a secured creditor's claim on real property to the value of the real property at the time of the discharge. The Supreme Court held that a chapter 7 debtor could not. <u>Id.</u> at 502 U.S. 410-20. It did not involve the application of a lien on property acquired by a chapter 11 debtor-in-possession post-petition: i.e., the issue presented here.

However, <u>1441 Veteran Street</u> does support the Lenders' position. As Ninth Circuit Court of Appeals authority, <u>1441 Veteran Street</u> is binding on this court. In <u>1441 Veteran Street</u>, as in <u>Dewsnup</u>, the collateral was also real property. However, the dispute was over whether the secured creditor's security interest could attach to and be increased by rents produced post-petition. The Ninth Circuit held that it could be, relying heavily on <u>Dewsnup</u>. <u>1441 Veteran Street</u>, 144 F.3d at 1291. In <u>In re Veeco Inv. Co.</u>, 170 B.R. 149, 153 (Bankr. E.D. Mo. 1994), which involved a similar issue, the court reached the same conclusion.[7]

Finally, the case cited by the Lenders that is most closely on point as a factual matter is <u>In re Machinery, Inc.</u> 287 B.R. 755 (Bankr. E.D. Mo. 2002). As here, in <u>Machinery</u>, the secured creditor

---

minority view.

[7]Two of the cases cited by the Lenders--<u>In re Tower Air, Inc.</u>, 397 F.3d 191, 202 (3rd Cir. 2005) and <u>In re Muma Services, Inc.</u>, 322 B.R. 541, 559 (Bankr. D. Del. 2005)--applied the "equity exception" of 11 U.S.C. § 552(b)(1) and thus are also inapposite.

13

claimed a security interest in post-petition receivables pursuant to 11 U.S.C. § 552(b)(1) as an increase to the value of its secured claim. The debtor argued the value of the secured creditor's interest was frozen at its value as of the petition date. The Machinery court rejected this argument, relying on Dewsnup and Veeco as well as the plain language of 11 U.S.C. § 552(b)(1).

Based on 1441 Veteran Street, the Court concludes that it is bound to conclude (and in any event is persuaded) that the value of a secured creditor's security interest in proceeds pursuant to 11 U.S.C. § 552(b)(1) can exceed the value of its security interest on the petition date. As a result, but for the unaccounted for proceeds from the Post-Petition Loan in the approximate amount of $1,000, the Lenders would clearly be entitled to foreclose on the Post-Petition Assets in their entirety. The Court has puzzled over the effect of this unaccounted for $1,000 amount. It has considered various remedies: e.g., disregarding the amount as de minimus, requiring the unaccounted for amount to be paid to the estate.

The Court has concluded that the most appropriate remedy is to place the burden of proof on tracing with respect to this amount on Qmect. Because Qmect has failed to establish that the unaccounted for $1,000 amount was used in the production of the Post-Petition Assets, the Court will find that, more likely than not, like the rest of the $100,000 deposited in the BofA Account, it was used to pay pre-petition debt. As a result, the Court will grant the Lenders relief from the automatic stay to foreclose on the Post-Petition Assets in their entirety.

14

The Lenders are directed to submit a proposed form of order in accordance with this decision.

END OF DOCUMENT

COURT SERVICE LIST

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

Robert R. Moore
Allen Matkins Leck Gamble & Mallory LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111

Philip J. Nicholsen
Law Offices of Philip J. Nicholsen
221 Main St., #740
San Francisco, CA 94105

16