Entered on Docket
January 25, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: January 25, 2007



_____
**LESLIE TCHAIKOVSKY
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                       No. 04-41044 TK
                                            Chapter 7
QMECT, INC.,

        Debtor.
_____/

**MEMORANDUM OF DECISION**

The above-captioned case was converted to chapter 7 on October 6, 2006, and John T. Kendall ("Kendall"), a panel trustee, was appointed as the interim trustee. At a continued meeting of creditors on December 5, 2006, various creditors requested an election of a permanent trustee. At the election, the four creditors who voted all cast their votes in favor of Carol Wu ("Wu"). The validity of the election was contested by Kendall and Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC ("collectively "Burlingame").[1]

---

[1] Burlingame was formerly the principal secured creditor in the case. However, after obtaining relief from the automatic stay, it foreclosed its security interest. At present, it holds an unliquidated claim for attorneys' fees and costs.

On December 12, 2006, the Office of the United States Trustee ("UST") filed a Report of Disputed Election of Chapter 7 Trustee (the "UST's Report"). On December 13, 2006, a motion to confirm the election was filed by Philip J. Nicholsen ("Nicholsen"), on his own behalf, as an administrative creditor and as attorney for Frank Nagy ("Nagy"), a purported general unsecured creditor. The motion was opposed by Kendall and Burlingame. The motion came on for hearing on January 12, 2007 and was taken under submission. This Memorandum addresses the issues raised by the motion.

**DISCUSSION**

There are two issues presented by this motion. The first issue is whether the election was timely. The second issue is whether qualifying creditors holding a sufficient amount of claims requested the election. Unless these issues are both answered in the affirmative, Kendall is the permanent trustee. If the election was timely and qualifying creditors holding a sufficient amount of claims requested the election, Wu is the permanent trustee since no votes were cast for Kendall. As discussed below, the Court concludes that the election was timely but that qualifying creditors holding a sufficient amount of claims did not request the election. Therefore, the Court concludes that Kendall is the permanent trustee.

**A. WAS ELECTION OF WU AS TRUSTEE TIMELY?**

The UST appoints an interim trustee promptly after the order for relief is entered. 11 U.S.C. § 701(a)(1). Normally, the interim trustee becomes the permanent trustee. However, creditors may elect a different trustee as the permanent trustee at the meeting of

2

creditors held under 11 U.S.C. § 341.  11 U.S.C. § 702(b).  The service of the interim trustee terminates when the person elected to be the trustee files a bond with the court.  11 U.S.C. § 701(b).

In the above-captioned case, after the case was converted to chapter 7, a meeting of creditors pursuant to 11 U.S.C. § 341 was scheduled for November 7, 2006.  Fred Koelling ("Koelling"), the responsible person for the debtor (the "Debtor"), appeared at the meeting on this date but counsel for the Debtor did not.  Kendall declined to examine Koelling without counsel present and continued the meeting to December 5, 2006.  An election of a different trustee was requested at that time.  The election took place the same day.

Kendall contends that the election was untimely: i.e., that it should have occurred on November 7, 2006.  In support of this contention, he cites In re Conco Bldg. Supplies, Inc., 102 B.R. 190 (Bankr. 9th Cir. 1989) and In re Globe Illumination Co., 149 B.R. 614 (Bankr. C.D. Cal. 1993).  In Conco, the issue was when the two year limitations period for filing a preference action began to run.  The limitations period does not begin to run until there is a permanent trustee.  The interim trustee does not become the permanent trustee until there can no longer be a timely election of a different trustee.  11 U.S.C. § 702(d); Conco 102 B.R. at 191-92.

In Conco, the debtor was not present at the initial meeting of creditors and thus could not be examined at that time.  The meeting was continued, and the debtor was examined at the continued meeting.  The Conco court concluded that the limitations period did not begin to run until the date of the continued meeting.  It noted that Rule

3

2003(b)(1) of the Federal Rules of Bankruptcy Procedure ("FRBP") provides that the "'business of the meeting shall include the examination of the debtor under oath'[.]" Id. at 192. Thus, it concluded that the meeting was not "held" until the trustee had an *opportunity* to examine the debtor: i.e., at the continued meeting. Kendall contends that, in this case, he had an *opportunity* to examine Koelling on November 11, 2006 even those he chose not to do so due to the absence of the Debtor's counsel. See also In re Globe Illumination Co., 149 B.R. at 617 (describing the holding in Conco as requiring only the debtor's "presence" at the meeting of creditors).[2]

Kendall reads the language in Conco too broadly. The Conco court was not presented with a situation where the debtor *was present* at the first scheduled date for the meeting of creditors but was not examined until the date of the continued meeting. Its holding that the meeting of creditors was not concluded when the debtor *was not* present leaves open the question of whether the meeting could be concluded when the debtor *was present* but was not examined. In any event, the meeting was not concluded; it was continued. A continued meeting of creditors is still the meeting of creditors. See In re Hoseeinpour-Esfahani, 198 B.R. 574, 578 n.5 (Bankr. 9th Cir. 1996)("[I]f a permanent trustee is not appointed at the conclusion of the § 341(a) meeting of creditors, then the interim trustee serves as the permanent trustee in the case.") Thus, the Court concludes that

---

[2]Globe was also a statute of limitations case in which the debtor had not appeared at all on the first date set for the meeting of creditors. Id. at 616.

4

the request for the election was made and the election was conducted on a timely basis.

**B. WAS ELECTION PROPERLY REQUESTED?**

Section 702(b) of the Bankruptcy Code provides that the election of a trustee must be requested by creditors that may vote, as provided in subsection 702(a)(1), and that hold at least twenty percent in amount of the claims specified in subsection 702(a)(1) and which are held by creditors entitled to vote under subsection 702(a). Section 702(a)(1) provides that:

> A creditor may vote for a candidate for trustee only if such creditor–
> (1) holds an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(i)...;
> (2) does not have an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution; and
> (3) is not an insider.

Thus, in determining whether an election has been effectively requested, it is first necessary to determine the "universe" of creditors entitled to vote and the total amount of their claims. It is then necessary to determine the amount of the claims of the creditors within this "universe" requesting the election. If the latter amount is less than twenty percent of the former amount, the election has not been effectively requested.

As discussed below, using the UST's "universe" of claims as the starting point, the Court concludes that, after removing the disqualified claims, as discussed below, the "universe" of creditors

5

entitled to vote is $784,342.91. The Court concludes that the amount of the claims of the creditors within this "universe" requesting the election is $1,709.81. Since the latter amount is less than twenty percent of the former, the Court concludes that the election was not effectively requested and that Kendall is the permanent trustee.

**(1) "Universe" of Claims**

**(a) Claims Objected to By Nicholsen**

According to the UST's Report, the total amount of the "universe" of claims entitled to vote is $2,285,734.50.[3] However, as the UST acknowledges, this figure does not deduct the claims to which Nicholsen filed objections on December 5, 2006, just before the continued meeting of creditors. FRBP 2003(b)(3) provides that:

> In a chapter 7 liquidation case, a creditor is entitled to vote at a meeting if, at or before the meeting, the creditor has filed a proof of claim or a writing setting forth facts evidencing a right to vote pursuant to § 702(a) of the Code unless objection is made to the claim or the proof of claim is insufficient on its face.

Based on this rule, the amounts of the claims to which Nicholsen filed objections should be deducted from the calculation of the "universe" of claims entitled to vote.

---

[3] The Court calculates the starting figure for the "universe" of claims as $2,342,797.36. The Court has identified a series of errors and/or omissions made by the UST in its calculation that account for this discrepancy. However, because the UST's starting figure was not challenged by Nicholsen or by the creditors who requested the election and because this discrepancy does not change the outcome of the dispute, for convenience, the Court has used the UST's starting figure.

6

Kendall and Burlingame contend that Nicholsen has no standing to object to claims because he holds only an administrative priority claim. Thus, his claim would be paid before any distribution is made to a creditor holding a general unsecured claim. The Court would agree were Nicholsen's standing considered in connection with an objection to claim for purposes of precluding the creditor from receiving a distribution. However, as an administrative priority creditor, Nicholsen has a stake in how the bankruptcy estate is administered and thus what creditors are included within the "universe" of creditors for purposes of determining whether an election has been effectively requested.

The majority rule, with which the Court agrees, is that the inability to vote for a permanent trustee does not deprive a party in interest of standing to dispute the election.[4] For the same reason, the Court concludes that the administrative priority status of Nicholsen's claim does not deprive him of standing to object to general unsecured claims for purposes of a disputed permanent trustee election.

Burlingame argues that the claims objected to should not be deducted because the objections were filed on the day of the continued meeting of creditors and were not noticed for hearing or served on the claimants until after the meeting. Thus, it had no

---

[4] See In re Eddie Haggar Ltd., 190 B.R. 281 (Bankr. N.D. Tex. 1995); In re Klein, 110 B.R. 862, 876 (Bankr. N.D. Ill. 1990); In re Cohoes Indus. Terminal Inc., 90 B.R. 67, 70 (S.D.N.Y. 1988); contra In re Kopexa Realty Venture, 240 B.R. 63, 66 (Bankr. 10th Cir. 1999).

7

time to investigate whether the bases for the objections were valid. It also argues that the objections were frivolous and that the bases for the objections were not sufficiently detailed.

The Court finds Burlingame's arguments unpersuasive. FRBP 2003(a)(1) only requires that an objection be made to a claim for the creditor to be disqualified from voting. It does not require that the objection be noticed for hearing or served on the claimant nor does it set a deadline in advance of the meeting of creditors for filing such objections. Similarly, as set forth in FRBP 2003(a)(1), a creditor may acquire standing to request an election by filing a proof of claim just before the meeting of creditors. This timing might prevent other creditors from investing whether there was a basis for objecting to the claim so as to disqualify the creditor from requesting an election of a permanent trustee. The drafters of the rule obviously concluded that the need to conduct a trustee election promptly, if at all, made it necessary to dispense with more customary procedural protections.

The Court does not find frivolous the bases for the objections nor does it find them insufficiently detailed for purposes of disqualifying the creditors from voting for a permanent trustee. An objection must state a legal or factual basis for the objection. Before a claim can be disallowed, if the objection is factual in nature, evidence supporting the facts asserted must be provided. No evidence was provided in support of Nicholsen's objections. However, disqualifying a creditor from voting is not the same as disallowing the creditor's claim.

8

FRBP 2003(a)(1) makes it clear that normal procedural requirements should be relaxed by stating that a creditor may have standing to the request an election even if it has not filed a proof of claim merely by presenting a writing setting forth facts evidencing a right to vote. Similarly, some courts have concluded that even an oral objection made at the meeting of creditors is sufficient to place the claim in dispute as long as the court finds that the basis for the objection is not frivolous. <u>In re Valentine</u>, 296 B.R. 384, 387 (Bankr. E.D. Va. 2001).

In sum, the Court concludes that the general unsecured claims objected to by Nicholsen should be deducted from the "universe" of claims. The UST calculates the amount of the claims to be deducted $586,047.71. This is incorrect. The total amount of the claims objected to by Nicholsen is $629,037.71. However, two of the claims objected to asserted secured status: i.e., Claim Nos. 32 and 49 for a total amount of $156,484.24. The UST did not include these claims in the starting figure, and they should not be deducted from that figure now. Thus, the amount of the claims to be deducted from the this starting figure is only $472,553.47. This reduces the total amount of claims in the "universe" of creditors entitled to vote to $1,813,181.03.

**(b) Allegedly Duplicative IRS Claims**

Pursuant to FRBP 2003(b)(3), a creditor may also be disqualified from voting (and thus its claim from inclusion in the "universe" of claims) if the creditor's proof of claim is insufficient on its face. Nicholsen contends that two proofs of claims filed by the Internal

9

Revenue Service ("IRS")--i.e., Claim Nos. 38 and 53 in amounts totaling $206,217.70--which on their face appear to be duplicative of a third filed claim--i.e., Claim No. 56--should be deducted for this reason.[5]  The Court agrees.  Both Claim Nos. 53 and 56 expressly state that they are amendments to previously filed proofs of claim.  Thus, the "universe" is claims must be further reduced to $1,606,963.33.

**(c) Burlingame's Unsecured Claim.**

Burlingame contends that it has an unsecured claim for $1,413,132.80 in attorneys' fees and other costs that should be included within the "universe" of claims held by creditors entitled to vote.  It notes that the Court liquidated its claim in this amount in the judgment entered in Adversary Proceeding No. 04-4190.  The judgment referred to was granted in connection with a claim objecting to Burlingame's secured proof of claim, overruling the objection and allowing the claim, including in the amount of the attorneys' fees and costs set forth above.  Thereafter, Burlingame obtained relief from the automatic stay and foreclosed its security interest nonjudicially.  Thus, any unsecured deficiency claim has been extinguished. See Cal. Civ. Proc. § 580d.  Burlingame contends that the portion of its judgment for attorneys' fees and collection costs was not extinguished by the foreclosure sale.  In support of this

---

[5] Nicholsen also asserted that Claim No. 9 filed by Business Debt Solutions ("BDS") was duplicative of Claim No. 62 and should be deducted as insufficient on its face.  However, this claim has already been deducted as disputed since it was included in the claims to which Nicholsen filed an objection.

10

contention, it cites <u>Passanisi v. Merit-McBride Realtors, Inc.</u>, 190 Cal. App. 3d 1496, 1508-09 (1987). The Court finds <u>Passanisi</u> distinguishable.

In <u>Passanisi</u>, a secured creditor obtained a judgment for its attorneys' fees and costs in successfully defending a lawsuit filed by the debtor seeking to enjoin a nonjudicial foreclosure sale. The secured creditor then conducted the sale and purchased the property at the sale with a credit bid. The debtor filed a new action against the creditor, seeking a declaration that the foreclosure sale had not only extinguished the creditor's secured claim but also its judgment for attorneys' fees and costs in the injunction action. The court ruled against the debtor. It concluded that § 580d was not intended to extinguish the secured creditor's claim for its collection costs in satellite litigation initiated by the debtor. <u>Id.</u> at 1507-09.

Similar to <u>Passanisi</u>, the adversary proceedings in which the judgment was entered in favor of Burlingame for attorneys' fees and costs included a proceeding initiated by the Debtor pre-petition in state court, asserting various tort claims. However, this was not the proceeding in which Burlingame's judgment was granted. The judgment was granted in the proceeding filed in bankruptcy court, objecting to Burlingame's proof of claim. A party sued for tort claims is normally not awarded fees, even if the creditor successfully defends the action. Since the claim for attorneys' fees and costs was awarded as part of Burlingame's proof of claim, the Court concludes that it was also extinguished by Burlingame's nonjudicial foreclosure sale. As a result, this claim should not be

11

included in the calculation of the "universe" of claims for purposes of this dispute.

**(2) Claims Requesting Election**

As discussed above, at least provisionally, the "universe" of claims is $1,606,963.33.[6] Twenty percent of this amount is $321,392.66. The election was requested by following creditors with claims in the following amounts:

```
Ronald Oto ("Oto")                    $   1,709.81
Frank Nagy ("Nagy")                       614,203.63
Siegler Law Group ("Siegler")              94,067.83
Business Debt Solutions ("BDS")           117,141.57

                              Total       $827,122.84
```

If all of these creditors were qualified to vote these claims, the election was properly requested. However, the qualified status of each creditor has been challenged. The Court addresses each of these challenges below.

**(a) Oto's Claim**

This creditor's right to request an election of a permanent trustee and to vote for a permanent trustee has been challenged on the ground that he filed his proof of claim after the bar date. This challenge has no merit. Section 702(a)(1) provides that a creditor is entitled to vote if it holds a claim entitled to distribution under section 726(a)(2) or (3). Both of these subsections entitle the holder of a tardily filed claim to receive a distribution,

---

[6]The Court uses the word "provisionally" because, if any of the creditors that requested the election were not entitled to vote, their claims must also be removed from the "universe" of claims.

12

assuming there are sufficient funds left after payment of priority and timely filed general unsecured claims. See In re Michelex Ltd., 195 B.R. 993, 1001 (Bankr. W.D. Mich. 1996). Thus, Oto's claim was properly included in the claims requesting an election of a permanent trustee.

**(b) Siegler's Claim**

Siegler is a law firm that represented the Debtor prior to the commencement of the bankruptcy case and has an unpaid claim for attorneys' fees. Siegler filed a proof of claim, Claim No. 39, on June 21, 2004 in the amount set forth above. Attached to the proof of claim is an accounts receivable record showing the billing and payment history from October 17, 2002 through March 10, 2004. The Debtor's bankruptcy petition was filed on February 27, 2004. The record shows $20,000 in payments received on this account within 90 days of the filing. Siegler gave Nicholsen its proxy to request the election and to vote for the permanent trustee.

Siegler's status was challenged on two grounds. Burlingame contended that Nicholsen's proxy was improperly obtained. Kendall asserted that Siegler had an interest that is materially adverse to the estate given its receipt of arguably preferential payments as revealed by the proof of claim. Since the Court agrees with Kendall that Siegler's proof of claim on its face disqualifies Siegler from voting for a permanent trustee and thus from requesting an election, the Court need not address the proxy issue.

Siegler's proof of claim indicates that it received $20,000 in payments on the Debtor's account, presumably from the Debtor, during

13

the preference period. Since these payments have not been surrendered to the estate, assuming they are in fact preferential, Siegler's proof of claim is arguably subject to disallowance. See 11 U.S.C. § 502(d).[7] The Court is not holding that these payments were preferential. Siegler might be able to successfully defend against a preference action. However, the evidence provided by the proof of claim is sufficient to establish a prima facie case for a preference claim. Thus, Siegler's claim is subject to dispute which disqualifies it from voting for a permanent trustee or requesting an election.

**(c) Nagy's Claim**

Nagy filed a proof of claim, Claim No. 36, on June 21, 2004. He identified the basis for the claim as a pre-petition lease between Diablo Properties LLC ("Diablo") as lessor and Koelling as lessee. A copy of the lease is attached to the proof of claim. The attached lease indicates a lease term expiring August 31, 2004, with a lessee's right to terminate the lease two years earlier. Nagy alleges that Diablo assigned the lease to him and states that he believes that Koelling sublet the premises to the Debtor. He asserts the right to damages of various types in various amounts for an estimated total of $614,203.63.

Kendall and Burlingame challenge Nagy's qualification to vote for a permanent trustee and thus to request an election on several

---

[7] Siegler correctly notes that it is too late to file a preference action to recover these payments. See 11 U.S.C. § 546(a). However, it is not to late to disallow Siegler's claim.

grounds. First, they note that the lease is with Koelling, not the Debtor. There is no evidence that the lease was assigned or sublet to the Debtor other than Nagy's statement on information and belief. Second, the amount of the claim is unliquidated. As noted above, the total amount requested is referred to as "estimated."

In response to these challenges, Nagy filed a declaration stating that, at the same time the lease attached to his proof of claim was executed, he and the Debtor entered into a document entitled "Short Form of Lease." A copy of this document was attached to his declaration. This document describes the Debtor as the lessee. However, it refers to the lease term as ending in 2002 with a right to extend to 2004. More troubling, as noted by Burlingame, Nagy's signature on the document appears markedly different that his signature on the declaration. Thus, the authenticity of this document is subject to question.

The Court finds these challenges, taken together, sufficient to disqualify Nagy from voting and thus from requesting the election of a permanent trustee. If the only issue were the fact that the total claim was referred to as "estimated," the Court would find that Nagy was qualified to vote a claim in the liquidated amount of the pre-petition rent. However, the Court would find the proof of claim subject to dispute based on its description of Koelling as the lessee. The "Short Form of Lease," with its differing terms and questionable signature does not resolve that dispute. Thus, Nagy's claim must also be removed from the "universe" of claims.

15

### (d) BDS's Claim

BDS filed two proofs of claim, Claim No. 9 on March 18, 2004 and Claim No. 62 on November 15, 2006. As noted above, Claim No. 9 has already been removed from the "universe" of claims on the ground that Nicholsen objected to it as duplicative of Claim No. 62. BDS's proof of claim described the basis for the claim as services performed. The attached invoice shows how the amount of the claim was calculated. BDS appears to have negotiated discounted claims with various creditors of the Debtor on the Debtor's behalf. It purportedly had an agreement with the Debtor that it was entitled to 25% of any hypothetical savings as a result of these agreements.

BDS also holds fifteen percent of the Debtor's equity.[8] Kendall contends that this makes BDS an "insider" or otherwise disqualifies him from voting for a permanent trustee. Section 702(a) provides that a creditor may not vote for a permanent trustee if the creditor is an "insider" or holds an equity interest that is substantial in relation to such creditor's interest as a creditor. See 11 U.S.C. § 702(a)(2)&(3).

An equity holder is not necessarily an "insider." See 11 U.S.C. § 101(31). An equity holder is an "insider" only if it is a person in control of the Debtor. If the word "control" is construed narrowly, no equity holder with less than a majority interest would

---

[8] BDS received this equity in partial satisfaction of its pre-petition debt in the spring of 2003. At that time, the Debtor issued additional stock to various parties to prevent Burlingame from obtaining a controlling interest in the Debtor by foreclosing on Koelling's stock as its collateral.

16

qualify as an "insider." However, the Court concludes that the word "control" should not be construed narrowly. Insider creditors are distinguished from other creditors because they are in a position to know more about the debtor's financial condition and thus to obtain preferential treatment. BDS was clearly in this position, particularly given its role in negotiating settlements with the Debtor's creditors.

Moreover, even if BDS were not an "insider," the Court would find BDS disqualified from voting pursuant to 11 U.S.C. § 702(a)(3). Section 702(a)(3) compares the significance of the creditor's equity interest with the significance of the creditor's claim. BDS held fifteen percent of the Debtor's equity. Its $117,141.57 claim is less than fifteen percent of the Debtor's general unsecured debt. Thus, its equity interest is not insubstantial as compared to its claim as a creditor. Thus, BDS's claim must also be removed from the "universe" of claims entitled to vote for a permanent trustee.

## CONCLUSION

As discussed above, the Court concludes that three of the four creditors that requested the election of a permanent trustee were disqualified from voting and thus from requesting the election: Siegler, Nagy, and BDS. Their claims total $825,413.03. This amount must be deducted from the $1,606,963.33 previously computed as the "universe" of claims. Thus, the final amount of the "universe" of claims entitled to vote is $781,550.30. Twenty percent of this amount is $156,310.06. The only qualified creditor requesting the election was Oto who held a claim of only $1,709.81. This was less

17

than twenty percent of the claims in the "universe" and was thus insufficient. For that reason, the Court concludes that the election was not requested by the requisite number of creditors and was not effectively requested. As a result, the results of the election should be disregarded, and Kendall is the permanent trustee. Counsel for Kendall is directed to submit a proposed form of order denying Nicholsen's motion to confirm the election of Wu as the permanent trustee.

END OF DOCUMENT

18

COURT SERVICE LIST

Reidun Stromsheim
Stromsheim & Associates
201 California St., Ste. 350
San Francisco, CA 94111

Robert R. Moore
Allen Matkins Leck Gamble Mallory & Natsis LLP
Three Embarcadero Center, 12th Floo
San Francisco, CA 94111-4074

Adam Siegler
Siegler Law Group
9454 Wilshire Blvd., Ste. M-16
Beverly Hills, CA 90212

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

William C. Lewis
Brian Fitzpatrick
Law Offices of William C. Lewis
510 Waverly St.
Palo Alto, CA 94301-2009